## Richmond

### THOMAS M. LEWIS

### v.

### COMMONWEALTH OF VIRGINIA

June 17, 1983.

Record No. 820829.

Present: Carrico, C.J., Cochran, Poff, Stephenson, and Russell, JJ., and Harrison, Retired Justice*

---

* Justice Compton took no part in the hearing or adjudication of this appeal.

*Murray J. Janus (Fred A. Talbot; Theodore I. Brenner; Bremner, Baber & Janus*, on brief), for appellant.

*Donald R. Curry, Assistant Attorney General (Gerald L. Baliles, Attorney General*, on brief), for appellee.

POFF, J., delivered the opinion of the Court.

A jury convicted Thomas M. Lewis of grand larceny by receiving stolen goods and, confirming the verdict, the trial court imposed a sentence of 12 months in jail and a fine of $1,000.

Called as a witness by the Commonwealth, Cornelius Williams testified that he and Peter Lawson planned to burglarize the Virginia Gold and Silver Company, a concern owned by John Greer. Lawson declined to participate personally but introduced Williams to James Sweeden. During the early morning hours of Saturday, December 20, 1980, Williams and Sweeden broke and entered Greer's establishment and stole several sacks of silver coins and an undetermined quantity of gold and diamond rings, gold chains, and cash, all of which they delivered to Lawson.

Lawson and Sweeden were fellow employees of Standard Furniture, a retail furniture business operated by defendant Lewis. Lewis was also engaged in the gold and silver market, doing business as Standard Distributors. A few hours following the burglary, Lawson took the coins to Standard Distributors, and Lewis paid him $14,221 in cash. Lawson then gave Sweeden $2,000, the prearranged fee for his services as lookout, and divided the rest of the cash with Williams. That afternoon, Lawson sold Lewis some of the stolen rings and, on Sunday morning, most of the other jewelry. The three cash sales during the two-day period amounted to more than $20,000.

Lawson testified that when he made the Sunday sale, Lewis told him that "John Greer [had] called him and described the merchandise, that he knows that's where it came from." Lewis also told Lawson that "I know you didn't steal it, but we're as guilty as the ones that did because we bought it. . . . I'll cover it up now, I have no other choice, but we're as guilty as the ones that took it."

Over defendant's objection, Lawson was permitted to describe the details of two earlier sales he had made to Lewis. In October 1980, Lawson sold defendant several items of jewelry which he had acquired from Williams. Lawson admitted he "knew it was stolen because . . . it was brand new, it had price tag strings still on it. And the stones were removed." When one of Lewis' employees commented on these facts, Lewis told him, "Shut up and go ahead and pay the man." A few days later, Lawson sold Lewis seven "men's rings with no stones in them, and they were obviously new, there were no scratches or anything on them". Lewis'

clerk observed that he would "hate to have his fingerprints on those", and Lewis remarked, "We don't need to comment, just go ahead and pay the man."

Testifying in his own defense, Lewis admitted that he had often bought precious metals from Lawson, "probably four days a week at least"; that he knew Lawson did not have a dealer's license; and that he knew the transactions were "improper". He explained that he did so because "I extend certain courtesies to my employees". Lewis denied purchasing jewelry with price tag strings attached or any other property which appeared to be stolen. The largest purchase he had made from Lawson prior to December 20, 1980, was "[a]bout $3,000", and Lewis acknowledged that the coin sale "was a rather large amount for [Lawson]" and that the size of the three sales in the two-day period "was unusual". Lewis admitted that he was sufficiently suspicious about the coins to inquire if they were "hot", but when Lawson assured him that they had not been stolen, he paid him "the fair market" price. Lewis said that Greer had told him about the "break-in" in a telephone call "sometime in the afternoon" on Saturday, but Lewis testified that nothing Greer had said enabled him to recognize the items purchased from Lawson as property stolen from Greer's store. Lewis denied that he had told Lawson about the telephone call.

Sometime after the Sunday sale, Lawson was arrested in Florida on an extradition warrant. He called Lewis and asked for money to hire an attorney to "fight extradition". Lewis loaned him money for that purpose and, after Lawson was extradited, posted his bail bond, loaned him money to buy a car, and placed him back on his payroll. Lewis explained that he had done similar favors for other employees, including Sweeden.

The defense called Arthur Wilkinson, a coin shop operator, as a witness. Wilkinson testified that he was acquainted with defendant and other dealers in the precious metals market; that it was customary practice in the business to conduct transactions in cash; and that defendant enjoyed a good reputation for truth and veracity. On cross-examination, the Commonwealth inquired whether he knew "Rocky" Ward, another coin shop operator, and, if so, whether Ward was employed by "International Gold and Silver". Wilkinson testified that he "knew him socially" and as a business competitor but did not know his employment status. The Commonwealth then asked whether Wilkinson had been "involved as a witness against Mr. Ward's conspiracy to murder you", and Wil-

kinson said that he had. Defendant objected to the question and answer as irrelevant, inflammatory, and prejudicial and moved for a mistrial. The trial court denied the motion and admitted the testimony.

On appeal, defendant challenges this ruling, and we agree that it constitutes reversible error. The Attorney General argues that "the prosecution was . . . entitled to elicit this testimony to impeach Wilkinson's veracity." He reasons that the jury, given proof that the character witness "had been dishonest in his initial testimony concerning the extent of his knowledge of Ward," could properly infer that he "had been dishonest in his testimony concerning the defendant's reputation."

We reject that argument. We find nothing in Wilkinson's testimony to support the inference the Attorney General urges. The witness answered the prefatory questions responsively. The fact that he did not volunteer a more expansive explanation of the extent of his knowledge of Ward does not prove that those answers were dishonest or that his veracity was suspect.

We can only speculate what inferences the jurors, or some of them, may have drawn when they learned about a murder conspiracy involving competitors in the precious metals business. But it is clear that such evidence raised sinister implications. None was probative of any element of the offense with which Lewis was charged, and we cannot confidently conclude that such wholly collateral testimony was harmless.

> Evidence which has no tendency to prove guilt, but only serves to prejudice an accused, should be excluded on the ground of lack of relevancy. For evidence to be admissible it must relate and be confined to the matters in issue and tend to prove an offense or be pertinent thereto. Evidence of collateral facts or those incapable of affording any reasonable presumption or inference on matters in issue, because too remote or irrelevant, cannot be accepted in evidence.

*Bunting* v. *Commonwealth*, 208 Va. 309, 314, 157 S.E.2d 204, 208 (1967).

We hold that the evidence elicited by the Commonwealth was prejudicial in that the implications it raised tended to divert the minds of the jurors from the issues before them and, thus, "prevented the accused from having that character of an impartial

trial to which one is entitled, however guilty he may be", *id.* at 314-15, 157 S.E.2d at 208. Accordingly, we will reverse the judgment and remand the case for a new trial.

Since an issue raised on this appeal may arise on retrial, we will consider it now. Defendant charges that the trial court "erred in permitting the Commonwealth to introduce evidence concerning two prior purchases of alleged stolen merchandise by the defendant".

 As a general rule, evidence that an accused has committed a criminal offense other than that charged in the indictment is inadmissible. This is because such evidence confuses one offense with the other, unfairly surprises the defendant with a charge he is unprepared to meet, and, by showing that the accused has a criminal propensity, tends to reverse his presumption of innocence of the crime on trial. Yet, the general rule, rooted in the fair-trial guarantee, must sometimes yield to society's interest in the truth-finding process. Whenever the legitimate probative value outweighs the incidental prejudice to the accused, evidence of prior offenses, if otherwise competent, is admissible.

> Evidence of other offenses is admitted if it shows the conduct and feeling of the accused toward his victim, if it establishes their prior relations, or if it tends to prove any relevant element of the offense charged. Such evidence is permissible in cases where the motive, intent or knowledge of the accused is involved, or where the evidence is connected with or leads up to the offense for which the accused is on trial. Also, testimony of other crimes is admissible where the other crimes constitute a part of the general scheme of which the crime charged is a part.

*Kirkpatrick* v. *Commonwealth*, 211 Va. 269, 272, 176 S.E.2d 802, 805 (1970).

 In all the several cases defendant cites in support of his argument, we struck the balance between prejudice and probative value in favor of the general rule. But here, we are of opinion the rule must yield to what has come to be known as the "guilty-knowledge exception".

The crime of which Lewis was convicted is defined by statute:

> If any person buy or receive from another person, or aid in concealing, any stolen goods or other thing, *knowing the*

*same to have been stolen*, he shall be deemed guilty of larceny thereof, and may be proceeded against, although the principal offender be not convicted.

Code § 18.2-108 (emphasis added).

Knowledge that the goods received were stolen property is an essential element of the crime, one which the Commonwealth must prove beyond a reasonable doubt. *Hey* v. *Commonwealth*, 73 Va. (32 Gratt.) 946, 951 (1879). Absent proof of an admission against interest, such knowledge necessarily must be shown by circumstantial evidence.

[G]uilty knowledge need not be directly proved. It may be shown by circumstances. It is sufficiently shown if the circumstances proven are such as must have made or caused the recipient of stolen goods to believe they were stolen.

*Reaves* v. *Commonwealth*, 192 Va. 443, 451, 65 S.E.2d 559, 564 (1951).

■ Defendant denied that he was aware the coins and jewelry he acquired from Lawson in December 1980 were stolen property. Lawson testified Lewis told him he knew otherwise. Given this conflict in the evidence of guilty knowledge, Lawson's testimony concerning the details of prior sales to Lewis was especially relevant. The items Lewis bought from him in October 1980 bore unmistakable indicia of stolen goods. Lawson knew they were stolen. Lewis' clerks suspected they were stolen. And the brusque remarks Lewis made to his clerks during those transactions indicate that he, too, recognized them as such. Less than three months later, Lewis bought similar merchandise in suspiciously large quantities from the same man.

These circumstances are "such as must have made or caused the recipient of stolen goods to believe they were stolen." *Id.* Applying the guilty-knowledge exception, we hold that Lawson's testimony was properly admitted in evidence.

*Affirmed in part,*
*reversed in part,*
*and remanded.*