COURT OF APPEALS OF VIRGINIA

Present:   Judges Annunziata, Bumgardner and Clements
Argued at Salem, Virginia


HARLESS FITZGERALD ROSE

MEMORANDUM OPINION[*] BY
v.      Record No. 0995-03-3          JUDGE JEAN HARRISON CLEMENTS
                                      JULY 6, 2004
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF WISE COUNTY
J. Robert Stump, Judge

Stephen J. Kalista; Walter Rivers for appellant.

Stephen R. McCullough, Assistant Attorney General (Jerry W. Kilgore,
Attorney General, on brief), for appellee.


Harless Fitzgerald Rose was convicted in a jury trial of capital murder, in violation of Code

§ 18.2-31, robbery, in violation of Code § 18.2-58, and the use of a firearm in the commission of a

robbery.  On appeal, Rose contends the trial court erred in allowing the Commonwealth to adduce

evidence in this case regarding a prior robbery allegedly committed by him.  Finding no error, we

affirm Rose's convictions.

As the parties are fully conversant with the record in this case and because this

memorandum opinion carries no precedential value, this opinion recites only those facts and

incidents of the proceedings as are necessary to the parties' understanding of the disposition of this

appeal.

_____

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

## I. BACKGROUND

The evidence relevant to this appeal is not in dispute. At approximately 10:30 p.m. on October 5, 2000, Timothy Hughes, James Brown, and Lucas Hurley, closed the Payless grocery store in Coeburn, Virginia for the night and walked to a nearby bank to deposit the store's money in a night deposit box. When the three men arrived at the bank's night deposit box, a man wearing a dark ski mask and dark clothing came around the corner, pointed a revolver at the men, and demanded the money. Brown could see some of the robber's skin around his eyes and noticed that he was Caucasian. Hurley threw the deposit bags at the robber, who caught them. When Hughes shuffled his feet or slipped, the robber shot him with the revolver. Hughes fell, but was able to right himself. The robber then ran back around the corner whence he had come, and Hughes gave chase.

Moments later, Brown and Hurley heard a second shot. They ran around the corner and saw the robber running away at a fast pace and Hughes lying on the ground. Before they could reach him, Hughes got up and started after the robber again. When Brown caught up to Hughes, they turned back and were joined by Hurley. Brown ran to a pay phone and called the police, informing them that the Payless store had been robbed and the store's manager shot. Meanwhile, Hurley remained with Hughes, who, after starting back to the bank, said he could go no farther and lay down in a parking lot. When rescue squad personnel arrived at the scene, they administered aid to Hughes and transported him to a local hospital. Upon his arrival at the hospital, however, Hughes was pronounced dead as a result of the gunshot wounds to his chest and abdomen.

Around 11:00 p.m. that same night, Shannon Kilgore, who lived approximately an eighth of a mile from the Payless store in Coeburn, saw a man dressed in black with a "black toboggan" on his head run through his yard, across the road, and "over the hill, through some brush" consisting of trees and briers. Robert Teaster, who was sitting in his truck outside Kilgore's house around 11:00 p.m., noticed a man dressed in dark clothes and "what looked like a toboggan" on his head

run through Kilgore's yard and across the road into some briers. Jessica Amanda Counts Salyers, Rose's former girlfriend, was also at Kilgore's house, getting some air outside, when she heard Teaster say "there goes somebody." Looking up, she saw a man running "really, really fast" across the road and down a "steep hill with briers, and a really, really tough terrain." She lost sight of the man but heard "the bushes ripping and rattling" as he went down the hill.

At approximately 1:30 a.m., Deputy Ernie Caldwell arrived at the scene of the robbery with a bloodhound to track the robber. Upon reaching the location where the robber was last seen, the bloodhound found a scent and started to track the robber's trail. The scent led the dog across a street and up a steep bank to some dense undergrowth and brambles that were "real tough." Caldwell could see that someone had recently torn through this thick brush. The dog tracked the robber's scent until they arrived at a gas station, where the petroleum odors caused the dog to lose the track.

At approximately 2:30 a.m., Deputy Russ Cyphers and Chief Investigator Mike Holbrook responded to a call about a trespasser in the Riverview section of Coeburn. Upon arriving at the reported location, they found Rose, who is Caucasian, walking in an alley near the Riverview Pentecostal Church. According to Cyphers, Rose seemed "very nervous." When asked what was going on, Rose explained that two of his friends, Joe Dwayne Mullins and Darrell Hayes, had dropped him off there because he wanted to see Salyers, who lived in the area, and that they were waiting for him at a carwash. Cyphers and Holbrook drove Rose to the carwash and left him with his friends. Cyphers estimated that the Riverview section of Coeburn is about "a mile, or a mile and a half" from the location of the robbery.

When the police later asked Rose if he knew the victim, Rose acknowledged that he had known Hughes for a long time and had played basketball with him.

At trial, Salyers testified about the rocky romantic relationship she had with Rose throughout 2000 and their extensive use of illegal drugs. Both developed severe addictions to Oxycontin and Dilaudid, prescription medicines they would dissolve in water and inject intravenously. According to Salyers, the two of them "shot up" with drugs as often as they could, sometimes up to "twenty to thirty times" a day, if they had the money. The amount of drugs they took was "[b]ased on the money" they had. Rose told the police that he and Salyers would spend $1,000 a week to feed their Oxycontin habits. The two sold drugs to support their habits. According to Salyers, "[e]very penny [they] got went to Oxycontin." When Rose could not supply Salyers with drugs, she would leave him until he was able to get more drugs. From May 2000 to October 2000, they did not "have much money" and only "had drugs half the time." Salyers had broken up with Rose a "week or two" before the robbery on October 5, 2000, because they had "run out of" drugs and money.

Salyers further testified that, a few months before the robbery, Rose talked to her about robbing the Payless store employees who made the night deposit. He told her that they did not have "cops" to "escort[] the person with the money bag."

According to Salyers, Rose drove to her house on October 6, 2000, the day after the robbery, and said he needed to talk. Salyers discovered that Rose had some Diluadid pills with him. They proceeded "to shoot" some pills. After going out to eat, they went to a hotel, where they each shot up "twenty to thirty" pills that night. Salyers noticed that Rose had new clothes and shoes and a "wad" of twenty and fifty dollar bills.

Salyers also testified, over Rose's objection, that Rose had perpetrated a robbery a few months before the robbery of the Payless store employees. Before allowing the Commonwealth to adduce this evidence, the trial court instructed the jury that it should consider the testimony only as

evidence of motive, scheme or plan, or identity and not as evidence that Rose committed the instant charge for which he was being tried.

Salyers described how she and Rose, with help from two other accomplices, formulated a plan on July 18, 2000, to rob Linda Couch, an "old lady" who lived in Coeburn. They knew that Couch, who had been Rose's neighbor for almost a year in 1999, would be returning home with her mother from an auction that night after 10:00 p.m. and that she would have Oxycontin pills prescribed by her doctor and a substantial amount of money in her purse. Salyers and the others would follow Couch home and honk their horn when they drove past her home. This would signal to Rose, who had been dropped off earlier and would be waiting behind a tree or bush, that Couch would soon be arriving home. The others would then park in an area above the house, where they would meet Rose after the robbery.

That night, Rose wore black sweatpants, a black shirt, and a dark blue jacket. He also wore a nylon hose over his head to conceal his face, and placed a hood over his head. When Couch arrived home at approximately 10:30 p.m., Rose approached her and hit her "really hard" in the back, knocking her against the hood of her car. When Couch would not relinquish her purse, he hit her again, knocking her to the ground. Finally, he pried the purse away from her and ran away up a "rough," "straight-up" hill, through some dense, "really harsh" vegetation that included briers. At the top of the hill, Rose met the others. They then drove to a motel and divided up the pills and money they found in Couch's purse.

Rose offered the testimony of several alibi witnesses. Among them, Mullins and Hayes testified that Rose spent the evening of the robbery helping Mullins repair a truck.

Keith Rose, Rose's nephew and Mullins's cousin, testified that, the day before the robbery, he drove with Mullins into Coeburn around 10:00 p.m., parked in the library parking lot, and watched the Payless employees make their night deposit in the bank's night deposit box. Mullins

told Keith Rose they were supposed to meet Hayes, but Hayes was not there. Mullins told Keith Rose not to say anything about their watching the night deposit being made. The day of the robbery, Keith Rose saw Rose and Mullins together. The morning after the robbery, Keith Rose saw Rose, Mullins, and Hayes together at Mullins's house in Tacoma. Mullins looked pale and scared. Keith Rose was not allowed to join the other three when they went into the basement, but he heard Hayes tell Rose that "everything would be all right."

Alvia Smith testified that she went to the Payless store between 4:00 and 6:00 p.m. on the day of the robbery. While she was there she saw Rose in the store with two other men, standing next to the pay phone.

Following the presentation of evidence, the trial court instructed the jury regarding the evidence of the alleged prior robbery as follows:

> You may consider evidence that Harless Rose may have committed an offense other than the offense for which he is on trial only as evidence of modus operandi, motive, scheme or plan, an/or identity, in connection with the offense for which he is on trial, [a]nd for no other purpose. You shall not consider this as evidence of a predisposition to commit an offense.

The jury convicted Rose of capital murder, robbery, and use of a firearm in the commission of a robbery and recommended that Rose be sentenced to life in prison for the murder, thirty-five years in prison for the robbery, and three years in prison for the firearm charge.

Prior to sentencing, Rose moved to have the jury's verdict set aside, arguing, *inter alia*, that the evidence regarding the robbery of Couch should not have been admitted at trial. During the hearing on that motion, the trial court took judicial notice that Coeburn is a "very small town." The trial court denied Rose's motion to set aside the verdict and subsequently sentenced Rose in accordance with the jury's recommendation.

This appeal followed.

II.  ANALYSIS

On appeal, Rose contends the trial court abused its discretion in allowing the Commonwealth to introduce evidence of the robbery of Couch to show that he committed the charged crimes.  While conceding that there were some "tenuous and general" similarities between the Couch robbery and the robbery of the Payless store employees, he argues that the two robberies were not sufficiently idiosyncratic and similar to each other to permit an inference that the same person committed them both.  He further argues that, even if the evidence of the prior robbery had some probative value, the prejudicial effect of that evidence outweighed the probative value.  Thus, he concludes, the evidence of the prior robbery was improperly admitted.

In response, the Commonwealth argues that the evidence regarding the robbery of Couch was properly admitted because the circumstances of the two robberies were sufficiently similar and idiosyncratic to demonstrate a common *modus operandi* and the probability of a common perpetrator.  Thus, the Commonwealth argues, the evidence of the prior robbery was relevant in resolving the central issue in the case, the identity of the person who robbed the Payless employees and murdered Hughes.  Any incidental prejudice resulting from the jury knowing that Rose had previously committed a similar offense, the Commonwealth asserts, was outweighed by the probative value of the evidence.  Thus, the Commonwealth concludes, the trial court did not abuse its discretion in admitting the evidence concerning the robbery of Couch.  We agree with the Commonwealth.

Under familiar principles of appellate review, we consider "the evidence and all reasonable inferences arising therefrom in the light most favorable to the Commonwealth," the prevailing party below.  Chichester v. Commonwealth, 248 Va. 311, 314, 448 S.E.2d 638, 641 (1994).

"The standard governing the admission of evidence of other crimes in the guilt phase of a criminal trial is well established. Generally, evidence that shows or tends to show that a defendant has committed a prior crime is inadmissible to prove the crime charged." Johnson v. Commonwealth, 259 Va. 654, 676, 529 S.E.2d 769, 782 (2000). "But there are important exceptions to that rule. Evidence of other crimes is admissible if it tends to prove any fact in issue, even though it also tends to show the defendant guilty of another crime." Spencer v. Commonwealth, 240 Va. 78, 89, 393 S.E.2d 609, 616 (1990) (citation omitted). "[O]ne of the issues upon which 'other crimes' evidence may be admitted is that of the perpetrator's identity, or criminal agency, where that has been disputed. Proof of *modus operandi* is competent evidence where there is a disputed issue of identity." Id. (citations omitted).

> [E]vidence of other crimes, to qualify for admission as proof of *modus operandi*, need not bear such an exact resemblance to the crime on trial as to constitute a "signature" [or carbon copy]. Rather, it is sufficient if the other crimes bear "a singular strong resemblance to the pattern of the offense charged." That test is met where the other incidents are "sufficiently idiosyncratic to permit an inference of pattern for purposes of proof," thus tending to establish the probability of a common perpetrator.

Id. at 90-91, 393 S.E.2d at 616-17 (quoting United States v. Hudson, 884 F.2d 1016, 1021 (7th Cir. 1989)). Hence,

> [i]f the evidence of other crimes bears sufficient marks of similarity to the crime charged to establish that the defendant is probably the common perpetrator, that evidence is relevant and admissible if its probative value outweighs its prejudicial effect. The trial court, in the exercise of its sound discretion, must decide which of these competing considerations outweighs the other. Unless that discretion has been clearly abused, we will affirm the trial court's decision on this issue.

Chichester, 248 Va. at 327, 448 S.E.2d at 649 (citations omitted).

Applying these principles to the instant case, in which the identity of the perpetrator of the charged crimes was the primary issue in dispute, we hold the trial court did not abuse its

discretion in admitting the evidence of the Couch robbery in the guilt phase of the trial because that crime, while not a carbon copy of the charged robbery, was sufficiently idiosyncratic and similar to the charged robbery to establish the probability of a common perpetrator and the record supports a finding that the probative value of the evidence of the Couch robbery outweighed its potential prejudicial effect.

The two robberies occurred less than three months apart in the "small" town of Coeburn. In both incidents, the victims were confronted at approximately 10:30 p.m. by a solitary, Caucasian robber on foot who wore dark clothes to conceal his presence and a head covering and mask to conceal his identity. Neither robber was daunted by the fact that there were multiple witnesses present at the time of the robbery. Both robberies were fueled by the perpetrator's desperate need for drugs and involved careful planning with his accomplices. In both instances, the perpetrators knew the victims were vulnerable and had large amounts of money with them. In both crimes, the victims' attempts to resist or stop the robbers were met with violence. After committing the crime, each perpetrator fled on foot and later met his accomplices, who had dropped him off earlier, at their vehicle some distance away from the scene of the crime. Most strikingly, in making his getaway from the crime scene, each robber disdained easier routes of egress in favor of running up or down hillsides covered with thick prickly vegetation.

In light of this distinctive method of flight through brambles and briers, along with the other similar aspects of the crimes, we conclude that the robbery of Couch bears a singular strong resemblance to the pattern of the charged robbery, thus permitting the inference that the same person committed both crimes. Evidence of the prior robbery was therefore relevant to the issue of the identity of the perpetrator of the robbery of the Payless employees and the murder of Hughes. Because the identity of the perpetrator of those charged crimes was the central issue at the trial, we cannot say the trial court abused its discretion in finding that the incidental prejudice resulting from

the jury knowing Rose had previously committed a similar offense was outweighed by the probative value of the evidence.

Accordingly, we affirm the trial court's decision to allow the Commonwealth to adduce the evidence of the prior robbery and we affirm Rose's convictions.

<u>Affirmed.</u>