**Richmond**

RODNEY S. HEWSTON

v.

COMMONWEALTH OF VIRGINIA

No. 1776-92-1

Decided May 24, 1994

COUNSEL

David B. Olson, for appellant.

Marla Lynn Graff, Assistant Attorney General (Stephen D. Rosenthal, Attorney General, on brief), for appellee.

OPINION

WILLIS, J.—On appeal from his bench trial convictions of (1) abduction with intent to defile, (2) sodomy, and (3) malicious wounding, Rodney S. Hewston contends that the trial court erred in admitting evidence of another crime on the ground that it reflected a "signature" or *modus operandi.* We find no error and affirm the judgment of the trial court.

At approximately 3:00 a.m. on July 8, 1991, Carol Lynn Golda purchased cigarettes at a 7-Eleven Store on the corner of 49th Street and Washington Avenue in the City of Newport News. As she left the store and walked toward her car, she noticed Hewston sitting on the sidewalk between her car and a white, four door sedan with light blue interior. He told her his name was "Dwayne." She talked with him for about fifteen to thirty minutes. He then asked whether she knew a prostitute named "Greta." Golda said that she did and offered to take him to Greta.

Hewston and Golda left the 7-Eleven in Hewston's car. Shortly thereafter, Golda realized they were traveling in the wrong direction. She demanded that Hewston stop the car so she could get out. Hewston replied that he had a knife and threatened to kill her. He drove across the James River Bridge to a remote area in Isle of Wight County and parked behind a line of trees next to a field.

Hewston then pulled Golda forcibly from the car. He threw her on the ground, kicked her, and hit her. He wrapped her hair around his hand and pulled with great force. When she saw cars pass on a nearby road, Golda tried to scream, but Hewston strangled her to keep her quiet. He told her that he would "find something to shut [her] up with." He picked up a rock and hit her on the left side of her head. He then pushed her, stomach down, into the backseat of his car and sodomized her. After Hewston left the scene in his car, Golda began walking up the road. A passing mo-

torist stopped, took her to his house, and called the police. Deputy Gardner arrived and took pictures of the scene of the crime.

Golda spent six days in Riverside Hospital where doctors treated her for injuries to her liver and spleen, hepatitis, three broken ribs, a broken nose, a torn cornea, and a punctured left eardrum. While in the hospital, she identified a man from a photo spread. The police arrested and charged this man, but at the preliminary hearing, Golda stated that he was not the man who had attacked her.

On October 8, 1991, Deputy Fancher approached Hewston at his home on 44th Street. She noticed a light-colored, four-door Oldsmobile with light blue interior parked at his house. Hewston told her that his neighbor, Dwayne, sometimes drove this car. The next day, Deputy Fancher showed Golda a second photo spread. This time, Golda identified Hewston. Hewston denied that he was the assailant.

At trial, over Hewston's objection, the Commonwealth introduced the testimony of Denise Perry. Perry testified that in June 1991, Hewston approached her near Washington Avenue and 45th Street in Newport News and asked whether she "had seen Greta." She agreed to take him to Greta. After driving her around Newport News in his white car with blue interior, Hewston crossed the James River Bridge into Isle of Wight County where he attacked her violently and forcibly sodomized her. Perry testified that she cried during the attack because Hewston hurt her. She testified that he placed "his hand around [her] like half way around [her] throat and half way on [her] mouth" and "had his hand on [her] hair pulling [her] hair back." She said that she decided to tell the police about the attack on her when she learned of the attack on Golda. Perry took the police to the scene of her attack. The police identified it as the place where the attack on Golda had occurred.

On appeal, Hewston contends that the trial court erred in admitting Perry's testimony. He argues that the crime against Perry was not sufficiently similar to the crime against Golda to constitute a "signature" or *modus operandi*. *Henderson v. Commonwealth*, 5 Va. App. 125, 128-30, 360 S.E.2d 876, 878-79 (1987). We disagree.

■■■■ This case is controlled by the Supreme Court's decision in *Spencer v. Commonwealth*, 240 Va. 78, 393 S.E.2d 609, *cert. denied*, 498 U.S. 908 (1990). In *Spencer*, the Supreme Court said:

Generally, evidence of other offenses should be excluded if offered merely to show that the accused is a person likely to commit the crime charged. But there are important exceptions to that rule. Evidence of other crimes is admissible if it tends to prove any fact in issue, even though it also tends to show the defendant guilty of another crime.

*Id.* at 89, 393 S.E.2d at 616 (citations omitted). The Court went on to say:

[O]ne of the issues upon which "other crimes" evidence may be admitted is that of the perpetrator's identity, or criminal agency, where that has been disputed. Proof of *modus operandi* is competent evidence where there is a disputed issue of identity.

*Id.* (citations omitted). Discussing use of the term "signature" as a determinant of admissibility of other crimes evidence, the Court said:

The term is a useful one if it is understood only in the sense of requiring a distinctive *modus operandi*, such that the evidence of other crimes so resembles the pattern of the offense charged as to raise the probability of a common perpetrator. However, the term "signature" can also be misunderstood to require that evidence of other crimes may not be admitted unless they are virtual carbon copies of the case on trial. That, in our view, is an unwarranted restriction of the *modus operandi* exception.

We adopt the standard articulated by the Seventh Circuit in *United States v. Hudson*, 884 F.2d 1016 (7th Cir. 1989): evidence of other crimes, to qualify for admission as proof of *modus operandi*, need not bear such an exact resemblance to the crime on trial as to constitute a "signature." Rather, it is sufficient if the other crimes bear "a singular strong resemblance to the pattern of the offense charged." That test is met where the other incidents are "sufficiently idiosyncratic to permit an inference of pattern for purposes of proof," thus

tending to establish the probability of a common perpetrator.

*Id.* at 89-90, 393 S.E.2d at 616 (citations omitted) (footnote omitted).

Hewston denied attacking Golda. The identity of her assailant was the central issue on trial. Evidence that Hewston had committed another crime under circumstances so similar as to constitute a *modus operandi* was relevant to the resolution of that issue.

We find that the evidence of the crime against Perry bears "a singularly strong resemblance" to the crime against Golda. The offenses against Golda and Perry occurred within a one month period. Both women were abducted from the same area in Newport News. Both were asked whether they knew Greta. Both crimes involved a white four door sedan with blue interior. Both women were taken across the James River Bridge to the same secluded location in Isle of Wight County. Both women were forced to lie on their stomachs in the back seat of the car and were forcibly sodomized. The assailant restrained both women by placing his hand on their throats and by forcefully pulling their hair. Both women identified Hewston from a photographic spread as their assailant.

Hewston argues that even though evidence of the attack on Perry described a *modus operandi* common to the attack on Golda, the evidence of the crime against Perry was so prejudicial to him that it should not have been admitted in his trial for attacking Golda. Again, we find guidance in *Spencer.*

Ultimately, the question whether to admit evidence of other crimes involves the same considerations as any other circumstantial evidence. "Every fact, however remote or insignificant, that tends to establish the probability or improbability of a fact in issue, is relevant, and if otherwise admissible, should be admitted." "Other crimes" evidence bearing sufficient marks of similarity to the case on trial to establish the probability of a common perpetrator is, therefore, usually relevant. The question remains, however, whether it is "otherwise admissible." That question requires the trial court to weigh its probative value against its prejudicial effect. "Whenever the legitimate probative value outweighs the incidental prejudice to the accused, evidence of prior offenses, if

otherwise competent, is admissible."

The responsibility for balancing the competing considerations of probative value and prejudice rests in the sound discretion of the trial court. The exercise of that discretion will not be disturbed on appeal in the absence of a clear abuse.

*Id.* at 90, 393 S.E.2d at 616-17 (citations omitted).

The identity of Golda's assailant was the central issue on trial and was the issue on which the question of Hewston's guilt turned. Perry's testimony had powerful probative value in resolving that issue. Any incidental prejudice resulting from the trial judge's knowledge that Hewston had previously committed a similar offense was clearly outweighed by the probative value of the evidence. We find no abuse of discretion in the trial court's receipt of Perry's testimony into evidence.

The judgment of the trial court is affirmed.

*Affirmed.*

Barrow, J., and Benton, J., concurred.