COURT OF APPEALS OF VIRGINIA


Present:   Judges Humphreys, Kelsey and Alston
Argued at Alexandria, Virginia


JAMES LITTLE, A/K/A
 JAMES BRADLEY
                                                            OPINION BY
v.      Record No. 1136-11-4                       JUDGE ROBERT J. HUMPHREYS
                                                            MARCH 6, 2012
COMMONWEALTH OF VIRGINIA


              FROM THE CIRCUIT COURT OF THE CITY OF ALEXANDRIA
                             Nolan B. Dawkins, Judge

              Joseph D. King (King, Campbell, Poretz, PLLC, on brief), for
              appellant.

              Eugene Murphy, Senior Assistant Attorney General (Kenneth T.
              Cuccinelli, II, Attorney General, on brief), for appellee.


       James Little[1] ("Little") appeals his conviction from the Circuit Court for the City of

Alexandria ("trial court") of two counts of receiving stolen property in violation of Code

§ 18.2-108.[2]  Specifically, Little contends that the trial court erred in convicting him of violating

Code § 18.2-108 (receiving stolen property) because the Commonwealth failed to present

sufficient evidence that the value of the stolen goods met or exceeded the minimum amount

required by the statute.  Because we find that there is sufficient evidence in the record to

establish that the stolen goods meet the statutory minimum, we affirm.


_____

        [1] James Little changed his name to James Bradley after the charges were brought in this
case.

        [2] Little was also convicted of two counts of statutory burglary in violation of Code
§ 18.2-91 and two counts of contributing to the delinquency of a minor in violation of Code
§ 18.2-371.  However, these convictions are not before us on appeal.

I.  Background

In an appeal challenging the sufficiency of the evidence, "'we view the evidence in the light most favorable to the Commonwealth, granting to it all reasonable inferences fairly deducible therefrom.'"  Baylor v. Commonwealth, 55 Va. App. 82, 84, 683 S.E.2d 843, 844 (2009) (quoting Sandoval v. Commonwealth, 20 Va. App. 133, 135, 455 S.E.2d 730, 731 (1995)).  So viewed, the evidence is as follows.

Little was a teacher at Potomac High School, where Nathaniel Wooten ("Wooten") matriculated as a student.  Little served as both an educator and mentor to Wooten, as he taught Wooten environmental science and acted as Wooten's modeling coach.  However, the student-teacher relationship evolved into criminal activity when Wooten involved Little in his plan to break into cell phone retail stores, steal the phones on display, and sell them.  Wooten asked Little to drive him to the stores since he did not have a driver's license.  Little agreed.

On May 29, 2010, Wooten and Little drove to an AT&T store in the Potomac Yards shopping center.  Little drove past the store so that Wooten could check out the surroundings and then parked the car.  Wooten then donned a mask and gloves, exited the vehicle, and threw a brick through the store's glass door.  Wooten quickly ran into the store using the hole in the glass and stole four display phones, including three Apple iPhones and a Motorola "Backflip."  He then returned to the car, and Little drove him home.

Two nights later, Little picked up Wooten and drove him to the AT&T store on Duke Street in Alexandria.  After waiting for a nearby store to close, Wooten again donned a mask and gloves, used a brick to smash the window, and entered the store.  Wooten managed to steal another four display phones, including three more Motorola "Backflips" and an HTC Tilt 2.  He then returned to the car, and Little drove him home again.

At trial, the Commonwealth called two different representatives from AT&T to testify as to the value of the stolen phones. Neil Carver ("Carver"), an asset protection manager with AT&T, testified as follows: On May 29, 2010, there were no iPhones in the store valued below $200. Specifically, the cost to the store for a new unit of each stolen iPhone on that date was $524. He then clarified that the full retail cost would be above this value, although he failed to give an actual retail value. Carver also explained that the full retail value of a phone is different from the price customers often pay for phones because they buy them with service contracts. There is a difference in price because

> when somebody comes in to AT&T to buy a phone, they're normally signing a contract for a certain length of time. It's a two or three year contract. AT&T will subsidize the actual cost of the phone, because they figure lowering that cost will drive the customer into the store. But the company will make the cost of that phone back up, plus more, over the length of the contract. So—so a phone that—that may be worth $500 may be sold for $200, with a two year contract.

On cross, Carver testified that demonstration phones are new when they are placed on display. However, through normal use as a "demo," the phones become "used and abused." Once a phone is used as a "demo," it is never sold from the store. Instead, "demo" phones are sent back to Supply Chain Management.[3]

Ellen Board ("Board"), the retail sales manager of the AT&T store on Duke Street in Alexandria, testified as follows: Board was informed of the break-in from the alarm company and went to the store in the early hours of May 31. Upon arrival, she observed that three "Motorola backflips [sic] and an HTC Tilt 2" phone were stolen. The value of each Motorola Backflip was $350 at the time of the robbery, and the HTC Tilt 2 was valued at $400. When the

---

[3] Supply Chain Management is the AT&T group responsible for handling the store's inventory, including purchasing phones from manufacturers.

display models were stolen, the store replaced them with new phones that were taken out of inventory.

Board went on to explain that display phones are "all shipped to [the store] as inventory. They're received in inventory, and then the phones that [the store] put[s] out on display are adjusted out of [the store's] inventory. So they're all the same, whether they're sold to a customer or put out in inventory." However, the store itself does not sell the display phones and, as such, they have no retail value to the store. Instead, when the display phones are no longer meant to be displayed, the store simply adjusts them back into inventory and then transfers them to the return center.

Little was tried in a bench trial and found guilty of two counts of statutory burglary in violation of Code § 18.2-91, two counts of contributing to the delinquency of a minor in violation of Code § 18.2-371, and two counts of receiving stolen property in violation of Code § 18.2-108. He then noted this appeal of the two counts of receiving stolen property.

## II. The Value of the Stolen Goods

When evaluating an appeal challenging the sufficiency of the evidence, we must "review the evidence in the light most favorable to the Commonwealth and give it all reasonable inferences fairly deducible therefrom. The judgment appealed from will be affirmed unless it appears from the evidence that it is plainly wrong or without evidence to support it." McGee v. Commonwealth, 4 Va. App. 317, 322, 357 S.E.2d 738, 740 (1987) (citations omitted).

Defendant was convicted of violating Code § 18.2-108(A), which states that any person who "buys or receives from another person, or aids in concealing, any stolen goods or other thing, knowing the same to have been stolen, . . . shall be deemed guilty of larceny thereof, and may be proceeded against, although the principal offender is not convicted." A conviction under this statute is made larceny, so it must be read in connection with Code §§ 18.2-95 and 18.2-96

- 4 -

to determine the degree of larceny.  See Wright v. Commonwealth, 196 Va. 132, 133, 82 S.E.2d

603, 604 (1954).  On appeal, the only issue is whether the value of the stolen goods reached the

$200 minimum to elevate the offense to grand larceny.

> At common law the value of the article stolen must be
> alleged and proved.  Proof that an article has some value is
> sufficient to warrant a conviction of petit larceny, but where the
> value of the thing stolen determines the grade of the offense, the
> value must be alleged and the Commonwealth must prove the
> value to be the statutory amount.

Id. at 139, 82 S.E.2d at 607 (internal citations omitted).  In Robinson v. Commonwealth, 258 Va.

3, 516 S.E.2d 475 (1999), the Supreme Court of Virginia discussed how the value of an item is

determined:

> The test is market value, and particularly retail value.  "Fair market
> value is the price property will bring when offered for sale by a
> seller who desires but is not obliged to sell and bought by a buyer
> under no necessity of purchasing."  And the original purchase price
> of an item is admissible as evidence of its current value.

Id. at 5-6, 516 S.E.2d at 476 (quoting Board of Supervisors v. Donatelli & Klein, Inc., 228 Va.

620, 628, 325 S.E.2d 342, 345 (1985)).  Furthermore, "[t]he value of the stolen property is

measured as of the time of the theft . . . ."  Parker v. Commonwealth, 254 Va. 118, 121, 489

S.E.2d 482, 483 (1997) (internal citations omitted).  However, "there must also be 'due

allowance for elements of depreciation.'  Without a showing of the effect of age and wear and

tear on the value of an item . . ., the jury might be misled to believe that original price equals

current value."  Dunn v. Commonwealth, 222 Va. 704, 705, 284 S.E.2d 792, 792 (1981) (quoting

Gertler v. Bowling, 202 Va. 213, 215, 116 S.E.2d 268, 270 (1960)).

However, in this case, there is no retail value for these phones.  While one could infer

that they would have some value in an open market, the fact remains these "demo" phones are

not sold by AT&T.  Instead, they are sent back to Supply Chain Management, at which point the

record is unclear as to their ultimate fate.  Put another way, the AT&T stores have no "desire" to

sell them.  Robinson, 258 Va. at 5-6, 516 S.E.2d at 476.  Thus, because of the unique nature of

these phones as demonstration units, they have no clear market value.  However, that does not

end our analysis.

The situation in this case is similar to that presented in Baylor v. Commonwealth, 55

Va. App. 82, 683 S.E.2d 843 (2009).  In Baylor, the appellant was removing catalytic converters

from used cars.  Id. at 84-85, 683 S.E.2d at 844.  Under the facts of that case, the catalytic

converters stolen could not legally be resold in Virginia.  Because of this unique circumstance,

we held that "'where an item had no market value, the actual value must be shown.'"  Id.

(quoting DiMaio v. Commonwealth, 46 Va. App. 755, 764, 621 S.E.2d 696, 701 (2005)).

In Baylor, we ultimately held that the Commonwealth had not met its burden in

establishing that the actual value of the stolen goods met the statutory minimum.  Id. at 90, 683

S.E.2d at 846.  However, the record in Baylor is very different from the record before the Court

in this case.  In Baylor, the only testimony elicited at trial to establish the value of the catalytic

converters was that of the owner of the auto dealership and the owner of the body shop where the

catalytic converters were stolen.  Id. at 85-86, 683 S.E.2d at 844-45.  Each testified only to the

cost of replacing the catalytic converters with new ones, despite the fact that the catalytic

converters were taken from cars that were three and four years old in the first instance, and from

cars of an unknown age in the second instance.  Id.  The record was devoid of any evidence

establishing the original cost of the catalytic converters or their fair market value at the time of

the larceny.  Id. at 86, 683 S.E.2d at 845.  Because of this, we held that the evidence was

inadequate to link the replacement cost to an accurate determination of the actual value, and thus,

the replacement value alone was insufficient as a matter of law to establish that the statutory

threshold was met.  Id. at 90, 683 S.E.2d 846.  However, we left open the possibility of using

replacement cost to assist in establishing value in future cases:

> To be clear, we expressly do *not* hold that evidence of an item's replacement cost may never be used to assist in establishing a stolen item's value. It is axiomatic that some items appreciate in value with the passage of time just as other items depreciate. Moreover, it is certainly conceivable that stolen property may be of such a character or recent manufacture that replacement value accurately reflects actual or fair market value.

Id. at 89-90, 683 S.E.2d at 846.

The case at bar is a good example of a scenario where replacement value can properly be considered in establishing actual value. The thefts in this case involved only "demo" phones. The stolen "demo" phones came from regular inventory and so did their replacements when they were stolen. The record reflects that there is no mechanical or design difference between the demonstration phones and the phones any customer receives when they purchase one from the store. Although there was no testimony as to the age of the phones and how long they had been used as "demo" models, a reasonable fact finder could nevertheless infer that they were new models, since stores only display phones currently for sale, and these phones were actually on display in the store. Furthermore, a reasonable fact finder could draw an inference that the phones were in good working condition, because stores do not tend to display broken inventory for demonstration purposes. Thus, since it is reasonable to infer that these phones were new models in good working condition, it naturally follows that evidence of their replacement value closely approximates their actual value.

The three iPhones stolen in the Potomac Yards incident cost the store $524 each to replace as of the date they were stolen. A new Backflip was valued at $350 just a few days later. Cumulatively, the replacement cost of the stolen phones would have been $1,922. In the Duke Street incident, three Motorola Backflips with a replacement cost of $350 each and an HTC Tilt 2 with a replacement cost of $400 were stolen. Cumulatively, the replacement cost of these phones totaled $1,450. Thus, in both incidents, the value of the stolen phones far exceeded the

statutory amount required to elevate the offense to grand larceny. Thus, we hold that the trial court did not err in finding the evidence sufficient to establish that the value of the stolen goods met or exceeded the $200 minimum amount required to elevate these offenses to grand larceny.

### III. Conclusion

The facts of this case present a situation in which the stolen items have no clear market value. As such, their actual value must be used to establish their value for the purpose of proving grand larceny. In this case, the evidence of value regarding the stolen items was of such a nature that a fact finder could reasonably conclude that their replacement cost was sufficient to establish that their actual value exceeded the statutory minimum of $200. Therefore, we affirm the judgment of the trial court.

Affirmed.