# COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present: Judges Athey, Friedman and Lorish
Argued by videoconference


MICHAEL WAYNE PENNINGTON, JR.

                                           MEMORANDUM OPINION[*] BY
v.        Record No. 1485-23-3            JUDGE LISA M. LORISH
                                              DECEMBER 16, 2025

COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF TAZEWELL COUNTY
Richard C. Patterson, Judge

David B. Kelley (The Kelley Law Firm, on briefs), for appellant.

Justin B. Hill, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.


After the murder of Kaitlyn Toler, a jury convicted Michael Wayne Pennington, Jr. of

first-degree murder, concealing a dead body, two counts of grand larceny, two counts of larceny

with intent to sell or distribute stolen property, credit card theft, felony credit card fraud, and

receiving goods from credit card fraud over $200. Pennington appeals these convictions. He

argues that the trial court erred in admitting prejudicial evidence, denying his speedy trial

motion, and dismissing his motion to sever his charges into two trials. He also argues that the

evidence was insufficient to support each of his nine convictions. For the reasons detailed

below, we affirm his convictions.

---

[*] This opinion is not designated for publication. *See* Code § 17.1-413(A).

BACKGROUND[1]

*The Disappearance of Kaitlyn Toler*

This case arises from the murder of Kaitlyn Toler. At the time of her death, 21-year-old Kaitlyn lived with her mother, Mary Toler, and her former stepfather, Pennington. Mary and Pennington had previously married and divorced before reconnecting and resuming cohabitation.

Pennington drove Kaitlyn and Mary to and from work. On March 30, 2021, which would later be estimated as the day of Kaitlyn's death, Pennington picked Kaitlyn up from her overnight shift and then picked Mary up from an early morning meeting. When they arrived to pick up Mary, Kaitlyn was wearing black yoga pants and a blue T-shirt. They dropped Kaitlyn off at home, and then Pennington drove Mary to work at a different location. Kaitlyn then texted Mary that she would pick up a shift at 4:00 p.m. that day.

Mary was surprised, then, when Pennington later picked her up without Kaitlyn in tow. Pennington explained that "some girl in a red car picked her up" and took her to work. He added that Kaitlyn may not answer her phone because it had been "messing up" and that she had taken her pink laptop and Mary's iPad with her. Mary found this strange, since Kaitlyn had not used the laptop since high school, and the iPad did not belong to Kaitlyn.

Mary messaged Kaitlyn throughout the evening but got no response. The next afternoon, Mary texted Pennington to ask what Kaitlyn was doing. Pennington told Mary that a "girl at [Kaitlyn's work] said she was working till 12" that night after swapping her shift.

Unbeknownst to Mary, Pennington had called Kaitlyn's work earlier that morning to ask whether she showed up for her shift (which she had not). Her coworker found this odd, as Pennington had never called before. Kaitlyn's manager also received a call from Pennington, in

---

[1] On appeal, this Court views the evidence and all reasonable inferences flowing from it in the light most favorable to the Commonwealth, the party that prevailed in the trial court. *See Goodwin v. Commonwealth*, 71 Va. App. 125, 129 n.1 (2019).

which Pennington explained that Kaitlyn had been picked up by a girl in a red car and that he received a message that she would soon return home.

By April 1, no one had heard anything from Kaitlyn. Pennington, however, claimed to have received a call from an unknown number in which a male voice told him that Kaitlyn was doing fine in Charleston, West Virginia and would return home in a few days. Mary believed this because Pennington had told her the week before that Kaitlyn was pregnant and might be seeking an abortion in Charleston. Then, while Pennington was outside on a walk, Mary herself received a call from an unknown number. She answered, but the caller immediately hung up. During a later search of Pennington's phone, officers found no evidence of the phone call he claimed to have received from the undisclosed man, but they did find that Pennington had called Mary's phone on April 1 using a technique to hide his caller ID.

*The Discovery of Kaitlyn's Body*

Early in the morning of April 6, two country club employees reported a body in the remote woods on the club's property. Investigators identified it as Kaitlyn's. She wore black yoga pants and a blue T-shirt—the same outfit Mary had last seen her in—but a different outfit than Pennington had reported to investigators.[2] The officers assessing the scene determined that she had been murdered elsewhere and dumped recently. They also believed that she had been deceased for at least one day.

An autopsy revealed that Kaitlyn died from ligature strangulation. Near the time of her death, she also suffered a three-inch laceration on her head that cut through her skull and injured

---

[2] During his initial interview with investigators, Pennington described Kaitlyn as having worn a floral print top with dark jeans when she allegedly left the Toler residence to go to work on March 30. But the floral top and dark jeans were later recovered at the Toler residence.

her brain but did not itself cause the death.  She was not pregnant and showed no signs of a recent abortion.

Officers notified her family, and Mary and Pennington both voluntarily provided DNA samples and consented to searches of their phones, car, and home.  Pennington, who was the last known person to have seen Kaitlyn, again told officers that she had been picked up by someone in a red car.  He also told officers about the alleged phone call he had received from an unidentified man, adding that he had heard Kaitlyn's voice in the background.

Investigators obtained security footage from Kenneth Thompson, a resident of Mountain Lane, the street leading to the woods where Kaitlyn was found.  Thompson also told officers that he had lent his trailer to Pennington on April 4 so Pennington could move furniture.  To Thompson's surprise, Pennington did not pick up the trailer until after 11:00 p.m., saying his nephew had called him to move the furniture that night.  Pennington then towed the empty trailer back towards his home.

The security footage revealed that, about an hour later, a vehicle resembling Pennington's towed a trailer with something on it down Mountain Lane towards the site where the body was found.  A half hour after that, a similar vehicle towing a similar trailer drove down Mountain Lane in the opposite direction.  Based on unique, after-market alterations, Thompson identified the trailer in the videos as the one Pennington had borrowed from him.  Pennington returned the trailer to Thompson's residence around 12:55 a.m.  Investigators timed the route from Mary and Pennington's home to the dump site and found it was consistent with the time stamps from Thompson's security footage.  They also noted that the vehicle towing the trailer was the only one to have traversed Mountain Lane during that period.

Also on April 4, Pennington borrowed his cousin's trailer hitch and ratchet straps.  Examiners later found hair fibers resembling Kaitlyn's distinctive red hair embedded in

the ratchet straps. DNA testing confirmed that the hair was either Kaitlyn's or one of her matrilineal relatives. Pennington maintained that his truck and the trailer sat at home all night.

Meanwhile, Mary and Kaitlyn's next-door neighbors were growing suspicious. One neighbor observed Pennington back the trailer up to their garage and leave the garage door open for approximately 20 minutes around midnight on April 4. Because he found this to be odd, he reported it to the police. The next day, April 5, another neighbor observed Pennington using the Toler residence's firepit. This neighbor had never seen Pennington use the firepit before, and the fire produced such a foul-smelling smoke that the neighbor, who was a wildland firefighter, felt it was unsafe to breathe.

*Pennington Becomes the Primary Suspect*

By April 11, Pennington had become the primary suspect. Investigators learned that Pennington had a history of stealing from the Toler residence. He had "cleaned out" Mary's checking account, pawned a shop vac and wedding ring set, and forced Kaitlyn to withdraw cash for him. The Toler women had been upset about the thefts. Kaitlyn had expressed her frustration to her mother, who warned Pennington that "he better not mess with any of [Kaitlyn's] things." Mary relayed to him that Kaitlyn would "call and report him and turn him into probation" if he stole anything else from her. Mary also warned that Kaitlyn had specifically threatened to report Pennington if he touched her boyfriend's Xbox.

Following Kaitlyn's disappearance, investigators recovered from a nearby pawn shop the Xbox and the items that Pennington claimed Kaitlyn had taken to work. The shop's records revealed that Pennington had pawned Kaitlyn's pink laptop on March 27 and Mary's iPad along with the boyfriend's Xbox on March 30. Officers also discovered that Pennington used Kaitlyn's debit card on March 29 and 30 to withdraw money. Officers then brought Pennington in for another interview, and he admitted to pawning the items for drug money.

Investigators then searched the Toler residence. They used luminol to reveal a large saturation of blood in the basement near the garage door, though it was unsuitable for DNA testing. The blood stain had a swipe pattern through it, indicating someone had tried to clean it up. About two months later, Mary found in the garage a 409 bottle with a bloody handprint on it, though again it was unsuitable for DNA testing.

Several years later, but before trial, Kaitlyn's cell phone was found behind the water heater in the Toler garage. The phone was stained with blood, but the DNA could not be tested. Analysis of the phone revealed that the last recorded movement was between 11:00 a.m. and 12:00 p.m. on March 30, 2017. The last text message was sent at 11:16 a.m.

*Pennington Proceeds to Trial*

On May 9, 2017, a grand jury indicted Pennington on 11 counts, including Kaitlyn's murder, concealing her body, and several theft offenses. Pennington moved to bifurcate trial of the murder-related offenses from the theft-related offenses. The trial court denied the motion, concluding that the Commonwealth had shown a sufficient nexus based on motive.

In 2020, the trial was put on hold after the Supreme Court declared a judicial emergency due to the COVID-19 pandemic. In March 2022, Pennington moved the court for a speedy trial to be set "at this term or the next term." The judicial emergency ended on June 22, 2022, and trial was scheduled for November 7, 2022. But the court then delayed the trial until March 20, 2023 out of concern for the jurors' safety after defense counsel inadvertently left a copy of the jury list with Pennington at the jail. In a recorded jail call, Pennington told another individual that he knew the jurors' names, addresses, and places of employment and that "it is a very small, small world." Pennington moved to dismiss the indictments based on his speedy trial claim, but the court denied the motions, holding that Pennington had forfeited his right to a speedy trial by remarking on the jurors' identities.

A first trial proceeded on March 20, 2023, but resulted in a mistrial. A second jury trial began on April 24, 2023, and lasted eight days. The Commonwealth called Mary, Thompson, several investigators and forensic examiners, and other individuals to testify. Pennington objected to the admission of various evidence, including text messages that referenced his probation. But Pennington did not produce any evidence on his behalf.

At the close of arguments, Pennington moved to strike each charge on sufficiency grounds. The court granted the motion with respect to two of the larceny charges but declined to strike the remaining nine charges. The jury found Pennington guilty of all nine charges.

Pennington moved to set aside the jury's verdict, and the court overruled the motion. Pennington also argued for a new trial based on the court's refusal to sever the offenses and the denial of his speedy trial motion.

The court sentenced Pennington to life in prison for murder, 5 years for concealing a dead body, 40 years for grand larceny, 40 years for larceny with intent to resell stolen property, 20 years for credit card theft, 5 years for credit card fraud, and 5 years for receiving goods by virtue of credit card fraud.

ANALYSIS

On appeal, Pennington argues that the trial court erred in admitting text messages that were highly prejudicial because they referenced his probation status. He also claims that his constitutional right to a speedy trial was violated and that the court abused its discretion in denying his motion to sever his charges into two trials. Finally, he challenges the sufficiency of the evidence to support each of his nine convictions. We first take up the questions about speedy trial and trial bifurcation. Then, we move to his argument that the probationary evidence was unduly prejudicial. Finally, we consider whether the evidence was sufficient to sustain each of his convictions.

I. Pennington's statutory speedy trial right was not violated.

Pennington argues that the trial court should have granted his motions to dismiss all the charges against him because the Commonwealth violated both his statutory and constitutional rights to a speedy trial. *See* U.S. Const. amend. VI; Va. Const. art. 1, § 8; Code § 19.2-243. He argues that he was prejudiced by the lapsed time from the end of the COVID-19 judicial emergency (June 22, 2022) to the commencement of his first trial (March 20, 2023) because it allowed for "continuous late discovery by the Commonwealth." We begin with his statutory claim.

A statutory speedy trial claim "presents a mixed question of law and fact." *Ali v. Commonwealth*, 75 Va. App. 16, 29 (2022) (quoting *Young v. Commonwealth*, 297 Va. 443, 450 (2019)). "[T]his Court gives deference to the trial court's factual findings but reviews statutory interpretations and legal conclusions de novo." *Osman v. Commonwealth*, 76 Va. App. 613, 657 (2023).

The Speedy Trial Act enumerates a time limit within which an accused must be tried. *Brown v. Commonwealth*, 75 Va. App. 388, 406 (2022); Code § 19.2-243. After a general district court has found probable cause that the defendant committed a felony, "the accused, if he is held continuously in custody thereafter, shall be forever discharged from prosecution for such offense if no trial is commenced in the circuit court within five months from the date such probable cause was found by the district court." *Commonwealth v. Hutchins*, 260 Va. 293, 294 (2000) (quoting Code § 19.2-243). But "[t]he five-month period provided for in Code § 19.2-243 is not absolute." *Young*, 297 Va. App. at 452. "Any delay in the trial which is attributable to the defendant will not be counted in determining whether the Commonwealth complied with the statutory speedy trial mandate." *O'Dell v. Commonwealth*, 234 Va. 672, 681 (1988). And continuances necessitated by a defendant's actions remain attributable to the

defendant even if they object to the continuance. *Shearer v. Commonwealth*, 9 Va. App. 394, 400 (1990).

Pennington only challenges the lapsed time from the end of the COVID-19 judicial emergency to the commencement of his first trial—an eight-month period that exceeds the five-month statutory limit. But his original trial date, November 7, 2022, was set within five months from when the judicial emergency ended on June 22, 2022. The court concluded the delay from November 7, 2022 to March 20, 2023 was attributed to Pennington because of his remarks on the recorded jail call. The court took Pennington's comments that he knew the jurors' names, addresses, and places of employment and that "it is a very small, small world" as creating an "extremely serious" risk to the jurors' safety.

As Pennington conceded at oral argument, the court's interpretation and assessment of the threatening nature of the call is a factual finding to which we must defer. *Osman*, 76 Va. App. at 657. And not only did the court find that Pennington had caused the continuance, it added that the continuance may have been in Pennington's best interest because it resulted in a new jury pool. The court determined that the prior jury pool "would have to be told" that "the defendant was provided with [the jury pool list] and ha[d] made a statement about knowing where people work." Disclosing such information to the jury would have likely been prejudicial to Pennington. *See Ali*, 75 Va. App. at 34 ("[A] 'deprivation' of the speedy trial right 'does not per se prejudice the accused's ability to defend himself' and 'may [actually] work to [his] advantage.'" (quoting *Barker v. Wingo*, 407 U.S. 514, 521 (1972))).

Accordingly, we cannot say that the trial court abused its discretion in continuing Pennington's trial and then denying his statutory speedy trial claim.

II.  Pennington's constitutional speedy trial right was not violated.

Like the statutory speedy trial challenge, the constitutional claim "present[s] 'a mixed question of law and fact[.]'" *Osman*, 76 Va. App. at 657 (quoting *Young*, 297 Va. at 450).  This Court gives deference to the trial court's factual findings but reviews legal issues de novo.  *Id.*

But in contrast to the statutory right, the constitutional right to a speedy trial "is governed by a balancing test that is not tied inextricably to calendar dates."  *Brown*, 75 Va. App. at 406-07.  The United States Supreme Court outlined four factors for a court to consider when analyzing a constitutional speedy trial claim: the "[l]ength of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant."  *Barker*, 407 U.S. at 530.  Pennington also points to the Virginia Constitution's speedy trial right, which has, to date, been recognized as at least as protective as the federal constitutional right.  *Ali*, 75 Va. App. at 34 (citing *Holliday v. Commonwealth*, 3 Va. App. 612, 615-16 (1987)).  Claims under both constitutions are analyzed using the same legal principles and framework.[3]  To begin, we find that Pennington asserted his right to a speedy trial below and now proceed to the other factors.

"The length of the delay is the 'triggering mechanism' for speedy trial analysis."  *Kelley v. Commonwealth*, 17 Va. App. 540, 544 (1994) (quoting *Barker*, 407 U.S. at 530).  "Unless there is sufficient delay to be 'presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance.'"  *Id.* (quoting *Barker*, 407 U.S. at 530).  A delay "approach[ing] one year is 'presumptively prejudicial' and requires further review."  *Ali*, 75

---

[3] In *Vlaming v. West Point School Board*, 302 Va. 504, 564 (2023), the Supreme Court explained that prior decisions concluding that rights under the Virginia Constitution were co-extensive with rights under the United States Constitution were merely "acknowledg[ments] that the then-existing interpretation[s]" of the United States Constitution "match[ed] our own understanding" of the analogous provision in the Virginia Constitution.  As Pennington has "not advanced any argument for a broader interpretation" than the baseline protection set by the Federal Constitution, we "refuse to 'speculate on such hypotheticals' in resolving this case.'" *Ibanez v. Alb. Cnty. Sch. Bd.*, 80 Va. App. 169, 203 (2024) (quoting *Vlaming*, 302 Va. at 564).

Va. App. at 35 (alteration in original) (quoting *Doggett v. United States*, 505 U.S. 647, 652 n.1 (1992)).

Yet we need not decide whether eight months is presumptively prejudicial. Rather, if the second factor—the reason for the delay—"is attributable to a defendant, there is no violation of his constitutional right to a speedy trial." *O'Dell*, 234 Va. at 364; *see also Barker*, 407 U.S. at 529 ("[I]f delay is attributable to the defendant, then his waiver may be given effect under standard waiver doctrine . . . ."). As discussed, the eight-month delay in this case was attributable to Pennington. The court below continued his trial after finding that his comments on the recorded phone call posed an "extremely serious" threat to the jurors—a factual assessment to which we defer.

In any event, as for whether Pennington was prejudiced, the burden was on him to establish actual prejudice. *See Reedy v. Commonwealth*, 77 Va. App. 81, 103 (2023) ("Appellant 'bears the burden of demonstrating actual prejudice, and not its mere possibility.'" (quoting *Kelley*, 17 Va. App. at 547)). Pennington argues that the delay prejudiced his case because it allowed the Commonwealth to conduct "continuous late discovery." But of the discovery that Pennington specifically protests, all was turned over *before* the eight-month period that he challenges on appeal, except the data from Kaitlyn's cell phone. While her phone was discovered before the eight-month period at issue, the data from the phone was given to Pennington's counsel one day into the eight-month period. Thus, the delay did not allow the Commonwealth to conduct continuous late discovery, as the phone had already been found. And Pennington failed to show how receiving the data from the phone two days earlier would have affected his case in any way. Further, as discussed above, the delay may have even benefitted Pennington because it allowed the court to select a new jury to replace the original one, which would have learned about Pennington's comments on the recorded call.

- 11 -

Considering Pennington's fault in causing the delay and the lack of prejudice, we conclude the trial court was correct to reject Pennington's argument that his constitutional rights to a speedy trial were violated.

III. The court did not err in declining to sever the theft charges from the murder charges.

Pennington next appeals the trial court's denial of his motion to sever his charges into two trials, one for the murder-related offenses and another for the theft-related offenses. He relies upon Rule 3A:10(c), which provides that a court "may direct that an accused be tried at one time for all offenses then pending against him, *if justice does not require separate trials* and (i) the offenses meet the requirements of Rule 3A:6(b) or (ii) the accused and the Commonwealth's attorney consent thereto." (Emphasis added). Pennington did not consent to joinder of the offenses, so we must consider whether the offenses met the requirements of Rule 3A:6(b) and whether justice required separate trials. Pennington avers that it did because the "murder-related charges were unrelated to the theft-related charges and having them tried together was extremely prejudicial [to] Mr. Pennington." We disagree.

"The question whether an accused, pursuant to Rule 3A:10(c), can be tried in a single trial for all offenses then pending against that defendant is a matter resting within a trial court's sound discretion." *Commonwealth v. Minor*, 267 Va. 166, 172 (2004); *see also Fincher v. Commonwealth*, 212 Va. 552, 553 (1972) (explaining that appellate courts may answer the severance question by simply holding that the lower court did not abuse its discretion). At the same time, "[a] lower court's interpretation and application of the Rules of the Supreme Court . . . present[] a question of law that we review *de novo*." *Cousett v. Commonwealth*, 71 Va. App. 49, 57 (2019).

To start, Rule 3A:6(b) permits joinder of offenses if the offenses are based on the same act or transaction, or on acts that constitute a common scheme or plan. To be "connected" under

- 12 -

the rule, the crimes must be "so intimately connected and blended with the main facts adduced in evidence, that they cannot be departed from with propriety." *Spence v. Commonwealth*, 12 Va. App. 1040, 1044 (1991). "A reviewing court must look to whether the transactions were 'closely connected in time, place, and means of commission, all of which supports the use of a single trial.'" *Doss v. Commonwealth*, 59 Va. App. 435, 449 (2012) (quoting *Yellardy v. Commonwealth*, 38 Va. App. 19, 24 (2002)). Alternatively, a "common scheme" involves "crimes that share features idiosyncratic in character, which permit an inference that each individual offense was committed by the same person or persons as part of a pattern of criminal activity involving certain identified crimes." *Scott v. Commonwealth*, 274 Va. 636, 645 (2007). A "common plan" describes crimes related to one another to accomplish a particular goal. *Id.* at 646.

Pennington committed the thefts at issue on March 27, 29, and 30—the last date being the estimated day of Kaitlyn's murder. This temporal proximity combined with Kaitlyn's threats to speak with Pennington's probation officer provide supporting evidence for the court's assessment that charges were sufficiently connected so as to be tried together.

Next, we must consider whether justice required that the charges be severed. We have required separate trials "where the evidence of one of the crimes is not admissible in the trial of the other." *Castillo v. Commonwealth*, 70 Va. App. 394, 414 (2019) (quoting *Godwin v. Commonwealth*, 6 Va. App. 118, 123 (1988)). Such evidence "confuses one offense with the other, unfairly surprises the defendant with a charge he is unprepared to meet, and, by showing that the accused has a criminal propensity, tends to reverse his presumption of innocence." *Godwin*, 6 Va. App. at 123 (quoting *Lewis v. Commonwealth*, 225 Va. 497, 502 (1983)).

This prong fares no better for Pennington. As we explain in the next section, evidence of Pennington's thefts would have been admissible even in a severed murder trial because the thefts

illustrated his motive to murder Kaitlyn. Thus, Pennington was not unfairly prejudiced and he has failed to show that the trial court abused its discretion in declining to sever his trial.

IV. The trial court did not err by admitting text messages that referenced Pennington's probation.

"It is fundamental that on appeal, a trial court's decision to admit or exclude evidence is reviewed for an abuse of discretion." *Flowers v. Commonwealth*, 84 Va. App. 143, 155 (2025). "The abuse of discretion standard draws a line—or rather, demarcates a region— between the unsupportable and the merely mistaken, between the legal error . . . that a reviewing court may always correct, and the simple disagreement that, on this standard, it may not." *Jefferson v. Commonwealth*, 298 Va. 1, 10-11 (2019) (alteration in original) (quoting *Reyes v. Commonwealth*, 297 Va. 133, 139 (2019)). "Only when reasonable jurists could not differ can we say an abuse of discretion has occurred." *Bista v. Commonwealth*, 303 Va. 354, 371 (2024) (quoting *Commonwealth v. Swann*, 290 Va. 194, 197 (2015)). Moreover, evidentiary errors are subject to non-constitutional harmless error review. *Jones v. Commonwealth*, 71 Va. App. 70, 91 (2019). They are reversible only if they prejudiced the defendant's case. *Smoot v. Commonwealth*, 37 Va. App. 495, 502 (2002).

Pennington argues that the court should not have admitted the two text messages referencing his probation because such evidence was unduly prejudicial since it indicated his prior criminal adjudication. It is true that the Virginia Rules of Evidence state that evidence of other crimes or bad acts is "generally not admissible to prove the character trait of a person in order to show that the person acted in conformity therewith." Va. R. Evid. 2:404(b). In any event, as Pennington recognizes, this rule does not automatically block the admission of evidence about prior bad acts. Indeed,

> if the legitimate probative value of such proof outweighs its
> incidental prejudice, such evidence is admissible if it tends to
> prove any relevant fact pertaining to the offense charged, such as

- 14 -

> where it is relevant to show motive, opportunity, intent,
> preparation, plan, knowledge, identity, absence of mistake,
> accident, or if they are part of a common scheme or plan.

*Id.*; *see also Sutphin v. Commonwealth*, 1 Va. App. 241, 245-46 (1985) (enumerating the most common issues for which evidence of prior bad acts are potentially relevant). But Pennington claims that the court abused its discretion in admitting the evidence because the messages were irrelevant to Kaitlyn's murder and thus did not fall under any exception to Rule 2:404(b). We disagree and affirm the trial court's decision to admit the evidence as probative of motive.

Specifically, Pennington claims that his being on probation "was not 'sufficiently idiosyncratic to permit an inference of pattern for purposes of proof[.]'" (Quoting *Hewston v. Commonwealth*, 18 Va. App. 409, 412 (1994)). But evidence need not evince a pattern in order to show motive.[4] Rather, motive can be shown through evidence of prior relations between the defendant and the victim or of the defendant's feelings toward the victim. *Kirkpatrick v. Commonwealth*, 211 Va. 269, 272 (1970). For example, in *Flowers*, this Court affirmed the admission of a video recording that showed the defendant arguing with the victim—although the video predated the victim's death by two years—because it was relevant to motive. *Flowers*, 84 Va. App. at 156. Or motive can be shown by evidence of prior bad acts that led up to the crime. *See Jordan v. Commonwealth*, 216 Va. 768, 770 (1976) (admitting evidence of an altercation between the defendant and victim that occurred several hours before the victim's death). Both *Flowers* and *Jordan* demonstrate that—contrary to Pennington's suggestion—the prior bad act need not be of the same type as the alleged crime at hand. *Flowers*, 84 Va. App. at 156; *Jordan*, 216 Va. at 770.

---

[4] Unlike this case, *Hewston* dealt with the modus operandi exception to prior bad act evidence. 18 Va. App. at 412.

At oral argument, Pennington clarified that he challenges only two text messages: "Can you pick me up so I can get some clothes and shower?  I have to be at probation at 1:30," and "let me go with you and go to probation while you are at New Hope[.]"  Both messages were part of a broader conversation that took place about one week before Kaitlyn's murder, when Mary had evicted Pennington from the house after discovering he "cleaned out" her checking account.  Pennington texted Mary begging to borrow her car and use her bathroom before his probation appointment.

We agree that these texts are probative of Pennington's motive because they demonstrate Pennington's fear of violating a probation condition.  *See Tibbs v. Commonwealth*, 31 Va. App. 687, 705 (2000) ("Motive . . . is relevant and probative on the issue of identity of the criminal agent.").  Based on his desperation in those text messages, one could infer that he was similarly desperate to prevent Kaitlyn from reporting him to his probation officer.  Moreover, they show that Pennington relied on Mary for shelter, food, and transportation and that he could lose all of this if Mary discovered his thefts.  The motive further links the thefts to the murder evidence, such that evidence of the thefts would have certainly been admissible in a separate murder trial. *See Castillo*, 70 Va. App. at 414.

The only remaining question then is whether the court erred in concluding that the legitimate probative value of the evidence outweighs its prejudice.  "The fact that some prejudice may result does not justify automatic exclusion." *Mayfield v. Commonwealth*, 59 Va. App. 839, 849 (2012) (quoting *Evans-Smith v. Commonwealth*, 5 Va. App. 188, 196 (1987)).  "Virginia law . . . intervenes only when the alleged prejudice tends to inflame irrational emotions or leads to illegitimate inferences." *Flowers*, 84 Va. App. at 156-57 (alteration in original) (quoting *Thomas v. Commonwealth*, 44 Va. App. 741, 758, *adopted upon reh'g en banc*, 45 Va. App. 811

(2005)).  After all, "[a]ll evidence tending to prove guilt is prejudicial to an accused."  *Powell v. Commonwealth*, 267 Va. 107, 141 (2004).

Assuming the messages were prejudicial, the prejudice was slight.  The messages did not discuss, for instance, the underlying conviction that led to his probation sentence.  Nor did they go any further than the other evidence of his probation that came in at trial without objection from Pennington.  Mary testified that she told Pennington that Kaitlyn would "call and report him and turn him into probation" if he stole anything else from her.  She also testified that Pennington was concerned by Kaitlyn's threats to report him to probation.  Pennington did not object to that testimony.  Accordingly, the jury learned of Pennington's status as a probationer regardless of the text messages.  Thus, we cannot say that the trial court abused its discretion in admitting the texts as more probative than prejudicial.

Finally, we reject Pennington's argument that the text messages should not have been admitted because they were not disclosed until after the discovery order's deadline.  There is no indication in the record—nor from Pennington's briefs—of when the text messages from Mary's phone were disclosed. Absent that information, there is no basis to determine whether there was any violation of the discovery order.

### V.  The trial court did not err in deeming the evidence sufficient to support each of Pennington's convictions.

Finally, Pennington argues that the evidence presented at trial was insufficient to support his convictions.  When reviewing the sufficiency of the evidence, "[t]he judgment of the trial court is presumed correct and will not be disturbed unless it is plainly wrong or without evidence to support it."  *Smith v. Commonwealth*, 296 Va. 450, 460 (2018) (alteration in original) (quoting *Commonwealth v. Perkins*, 295 Va. 323, 327 (2018)).  "In such cases, '[t]he Court does not ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'"  *McGowan* v. *Commonwealth*, 72 Va. App. 513, 521 (2020) (alteration in original)

(quoting *Secret v. Commonwealth*, 296 Va. 204, 228 (2018)). "Rather, the relevant question is whether 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Vasquez v. Commonwealth*, 291 Va. 232, 248 (2016) (quoting *Williams v. Commonwealth*, 278 Va. 190, 193 (2009)).

To convict Pennington of first-degree murder, the Commonwealth had to prove beyond a reasonable doubt that he (1) killed Kaitlyn (2) with malice (3) and in a willful, deliberate, and premeditated manner. Code § 18.2-32. "Malice inheres in the doing of a wrongful act intentionally, or without just cause or excuse, or as a result of ill will," and thus inheres in premeditation. *Tizon v. Commonwealth*, 60 Va. App. 1, 11 (2012).

Pennington contends that the evidence failed to prove malice or premeditation because "the Commonwealth could not prove the time of death, place of death, or any other specific as to the victim's death[.]" But he ignores the evidence of Kaitlyn's fatal injuries, of his motive to kill her, of his efforts to conceal the murder, of the time and location of Kaitlyn's final movements, and of a large blood stain in the garage. Much of this evidence was corroborated by witnesses like the Tolers' neighbors and forensic analysts. From all this, a juror could reasonably conclude that Pennington was guilty of Kaitlyn's first-degree murder. Even without the particularities of Kaitlyn's time and place of death, there was sufficient evidence for each element of first-degree murder.

Next, Pennington alleges that the jury did not receive *any* evidence at trial that showed Pennington concealed Kaitlyn's body. He claims the neighbor's security footage was so grainy as to be "in no way definitive as to what it portrays," while the hairs from the ratchet strap were "ill accounted for with a questionable chain of custody." We cannot agree. The jury heard firsthand testimony from three different witnesses that Pennington had—all on the same day— borrowed his cousin's ratchet straps and trailer hitch, retrieved Thompson's trailer to "move

some furniture" late at night, parked the trailer around midnight for about 20 minutes next to the Tolers' open garage, and returned the trailer to Thompson around 1:00 a.m. They also watched video footage that showed a truck resembling Pennington's tow a trailer that Thompson identified as his own with something on it towards the site where Kaitlyn's body was found and then back towards Pennington's house. Finally, they heard Pennington's contradicting statements that he had used the trailer to move furniture that night and that his truck sat home all night.

Pennington also disputes his larceny-related convictions on the basis that the evidence failed to prove that the stolen items were valued above $200 and failed to prove his intent to permanently deprive Kaitlyn of her laptop. Specifically, he contends that he received less than $200 for pawning them and that the pawns were still redeemable at the time of their recovery. He also challenges the trial court's jurisdiction over this charge because the pawns occurred in West Virginia. These arguments lack merit.

First, his jurisdictional challenge lacks merit because the thefts occurred at the Toler residence in Tazewell, Virginia. *See Rhodes v. Commonwealth*, 145 Va. 893, 895 (1926) (finding Virginia jurisdiction over a crime completed in Tennessee because the defendant intended to consummate the crime before crossing the state border). Next, as to the redeemability of the pawned goods, the evidence nonetheless demonstrated that Pennington took the laptop without permission and pawned it. The jury could thus infer his intent to permanently deprive Kaitlyn of her possession. *See McEachern v. Commonwealth*, 52 Va. App. 679, 685 (2008) ("In Virginia, absent countervailing evidence of an intention otherwise, 'the wrongful taking of the property in itself imports the *animus furandi*.'" (quoting *Bryant v. Commonwealth*, 248 Va. 179, 183 (1994)).

As for the value of the stolen goods, Pennington correctly states the requirement that the Commonwealth prove, beyond a reasonable doubt, that the stolen laptop and iPad were each worth at least $200. But he ignores the legal principle that "the original purchase price of an item is admissible as evidence of its current value" when considered alongside potential depreciation.[5] *Little v. Commonwealth*, 59 Va. App. 725, 731 (2012) (quoting *Robinson v. Commonwealth*, 258 Va. 3, 5-6 (1999)). Moreover, "[t]he opinion testimony of the owner of the stolen item generally is competent and admissible on the issue of the value of that property." *Parker v. Commonwealth*, 254 Va. 118, 121 (1997). Indeed, Mary testified that she purchased the iPad and laptop for "over $200" each. And as Pennington told Mary that Kaitlyn had allegedly taken both electronics with her to work on the afternoon she went missing, it is a fair inference that both were in good working condition when Pennington pawned them. Therefore, "[v]iewing the evidence in the light most favorable to the Commonwealth," as we are bound to do, Mary's testimony supports the jury's conclusion that the laptop and iPad were both worth at least $200. *Goodwin v. Commonwealth*, 71 Va. App. 125, 129 n.1 (2019).

Turning to the credit card fraud conviction, Pennington claims that "there was no evidence presented at trial that [he] took the credit card . . . [or] intended to defraud the victim or that the taking of the card was without the consent of the victim." This is not true. The Commonwealth presented photos of Pennington using Kaitlyn's debit card four times over the

---

[5] Pennington only argues that the court should have considered the value assigned by the pawn shop, not that the assets had depreciated in value from when Mary originally purchased them. Because Pennington has not advanced an argument about depreciation, we do not consider it here. *See Spratley v. Commonwealth*, 69 Va. App. 314, 318 (2018) ("The 'market value' or 'actual value' of an item takes into consideration factors such as age, condition, and depreciation." (quoting *Grimes v. Commonwealth*, 62 Va. App. 470, 477-78 (2013))).

two days preceding her disappearance. Bank records proved he withdrew $200 in total.[6] And the jury was permitted to infer that Pennington had taken Kaitlyn's debit card without her permission. *See Burton v. Commonwealth*, 58 Va. App. 274, 284 (2011) ("[T]he unexplained possession of recently stolen goods permits an inference of larceny by the possessor."). This is especially so given that at the time Pennington used Kaitlyn's card, she was upset with him for stealing other items from her and had threatened to turn him in to probation—rendering it unlikely that she would consent to his withdrawing $200 from her debit account.

Finally, regarding his conviction for receiving goods from credit card fraud, Pennington summarily alleged below and again on appeal that "there was no evidence at trial to prove that fraud took place or that any money, goods or services were received valued at over $200.00." This argument amounts to a "mere statement that the judgment or award is contrary to the law and the evidence," which is not sufficient to preserve the issue for our review. Rule 5A:18.[7]

Considering these circumstances, a reasonable fact finder could conclude that Pennington was the person who stole Kaitlyn's and Mary's personal property, then killed Kaitlyn, and dumped her body in an effort to conceal his crimes.

---

[6] At the time of Pennington's offense, felony credit card fraud required proof that the value obtained as the result of the fraud *exceeded* $200. Code § 18.2-195(c); 2018 Va. Acts ch. 794. Pennington did not argue below, or on appeal, that he should have been convicted only of misdemeanor credit card fraud because the evidence showed that he stole exactly $200. Instead, he has consistently argued only that there was no evidence indicating he intended to steal anything and therefore no evidence of value. Therefore, we cannot reverse his conviction even though the evidence shows he obtained only $200. *See* Rule 5A:20 ("An assignment of error that does not address the findings, rulings, or failures to rule on issues in the trial court or other tribunal from which an appeal is taken, or which merely states that the judgment or award is contrary to the law and the evidence, is not sufficient."); *see also Fadness v. Fadness*, 52 Va. App. 833, 851 (2008) ("If [appellant] believe[s] that the circuit court erred, it [is his] duty to present that error to us with legal authority to support [his] contention.").

[7] At the time of Pennington's offense, the crime of receiving goods from credit card fraud likewise became a felony only if the value received exceeded $200. Code § 18.2-197. Again, Pennington simply never argued that by receiving only $200, he should have been convicted of the misdemeanor offense.

## CONCLUSION

For these reasons, we affirm the rulings of the trial court.

*Affirmed.*